UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re:                                                    :
                                                          :          Chapter 11
HERB PHILIPSON'S ARMY AND NAVY                            :
STORES INC.,                                              :
                                                          :          Case No. 18-_____ (   )
                                Debtor.[1]                 :
                                                          :
------------------------------------------------------------X

## FIRST DAY AFFIDAVIT OF GUY VITI
## PURSUANT TO RULE 2015-2 OF THE LOCAL BANKRUPTCY
## RULES FOR THE NORTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK                    )
                                     ) ss.:
COUNTY OF ONEIDA                     )

Guy Viti, being duly sworn, deposes and says:

1.    I am the president, chief executive officer and the sole shareholder of Herb

Philipson's Army and Navy Stores Inc., a corporation organized under the laws of the state of

New York and the debtor and debtor in possession ("HP" or the "Debtor" or the "Company") in

the above-captioned chapter 11 case.  Founded in 1951, the Company is one of the largest

clothing retailers in Central New York – selling outdoor apparel and sporting goods, as well as

casual wear, work wear and footwear.  I have served in the capacity of president of HP since

March 2018.[2]  Prior to serving as president, I was an employee of the Company for

---

[1]    The last four digits of the Debtor's federal tax identification number are 4814.

[2]    I acquired the Company in March 2018, at which time I became HP's 100% equity owner.

approximately 37 years, serving in various roles (including the role of president of merchandising and operations, which role I held immediately prior to my acquisition of the Company).

2.      In my capacity as president of the Company, I am familiar with its day-to-day operations, business and financial affairs, and have hands-on management responsibilities with respect to those affairs. I have approximately 40 years of experience working in the retail industry.

3.      I submit this affidavit (the "Affidavit") pursuant to Rule 2015-2 of the Local Rules for the United States Bankruptcy Court for the Northern District of New York (the "Local Rules") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on October 8, 2018 (the "Petition Date"), and the Debtor's various first day applications and motions contemporaneously filed herewith (the "First Day Pleadings"). I have reviewed the Debtor's petition and the First Day Pleadings, and it is my belief that they are true and accurate to the best of my knowledge, and the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business while it seeks a restructuring and reorganization of its business under chapter 11 of the Bankruptcy Code.

4.      Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor, Griffin Hamersky LLP (the Debtor's proposed bankruptcy counsel) and Scouler Kirchhein LLC (the Debtor's proposed financial advisors and investment bankers), or my opinion based upon experience, knowledge, and information concerning the operations of the Debtor and the retail industry as a whole. I am authorized to submit this Affidavit on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth

herein.   Unless otherwise indicated, the financial information contained in this Affidavit is unaudited.

5.      The Affidavit is divided into four parts.   Part I offers an overview of the Debtor and a discussion of the Debtor's history, capital structure, business operations and prepetition indebtedness.   Part II addresses the circumstances leading to the filing of the Debtor's chapter 11 case, including the operational and liquidity issues causing the decline of the Debtor's business and certain actions threatened by one of the Debtor's prepetition secured lenders, Second Avenue Capital Partners LLC ("Second Avenue"), and efforts made by the Debtor to restructure its financial and operational affairs.   Part III sets forth information required by Local Rule 2015-2 to the extent not otherwise provided herein.   Part IV discusses the relevant relief sought in the Debtor's First Day Pleadings and the grounds for such relief.

## I.
## The Debtor's Business

A.      Company Overview and History

6.      Founded in 1951, HP is a retailer operating in Central New York. The Company employs 280 employees, consisting of 39 salaried and 241 full-time hourly and part-time hourly employees.   In 2016 and 2017, HP had revenues of approximately $43.5 million and $39.8 million, respectively. Through the first nine months of 2018, HP had revenues of $15.6 million.

B.      The Debtor's Capital Structure

7.      The Debtor is a single corporate entity of which I am the sole shareholder. The Company does not have any affiliated entities.

C.    The Debtor's Business Operations

8.    As noted herein, the Debtor is one of the largest clothing retailers in Central New York, selling apparel for the outdoors, casual wear, work wear, footwear and sporting goods. The Company has been outfitting customers in Central New York for the great outdoors for over 67 years and carries brands such as Carhartt, Columbia, Levi, Lee, Under Armour, Dickies, Timberland and The North Face in its stores. The Company is also the exclusive retailer for the Utica Comets Hockey Team and the new Utica City Football Club.

9.    In conjunction with the operation of its business, the Debtor operates nine retail stores, leasing commercial real property for those stores at: (i) 1899 Black River Boulevard, Rome New York; (ii) NH Shopping Center, 1 Center Street, New Hartford, New York; (iii) 2044 Glenwood Shopping Plaza, Oneida, New York; (iv) 1283 Arsenal Street, Watertown, New York; (v) 7421 Oswego Road, Route 57, Liverpool, New York; (vi) Arcadia Shopping Center, Newark, New York; (vii) 293 Street, Route 104 East,  Oswego, New York; (viii) Dewitt Town Center, 3179 Erie Boulevard East, Dewitt, New York; and (ix) 232 West Albany Street, Herkimer, New York.

D.    The Debtor's Prepetition Indebtedness

10.    The Debtor has approximately $3.3 million of secured debt, stemming from (i) $2.050 million of secured debt under that certain Loan and Security Agreement between the Debtor and Second Avenue, dated July 31, 2018, (the "Second Avenue Loan Agreement") and a related Equity and Security Pledge Agreement (collectively, the "Second Avenue Loan Documents") to fund the Debtor's operations; (ii) $637,500 of secured debt under that certain Security Agreement between the Debtor and Gary L Philipson, as of  March 2018, as amended, and a related secured promissory note, as amended, to fund all business purposes; and (iii) $612,500 of secured debt under that certain Security Agreement between the Debtor and Aviva

4

Philipson, as of March 2018, as amended, and a related secured promissory note, as amended, to fund all business purposes.

11.    The Debtor, has approximately $3.2 million of unsecured current liabilities, largely consisting of trade payables.

## II.
## Circumstances Leading to The Chapter 11 Filing

A.    Decline of the Debtor's Business

12.    The decline of the Debtor's business is directly attributable to a confluence of operational and liquidity factors. Starting in 2015, the Company began to suffer from decreased sales -- largely attributable to HP's inventory mix failing to appeal to the tastes of the market and the rise of e-commerce, which allowed the Debtor's customers to purchase from on-line retailers the same or similar good being offered by the Company.

13.    Additionally, during the Company's 2017 winter busy season, one the Company's banks closed the line of credit that it had routinely extended to the Company during the busy season. Without this line of credit, the Debtor was effectively forced to liquidate inventory during the peak Christmas season. This fire sale resulted in the sale of the Company's newest inventory, with the Debtor being left with older and more difficult to sell inventory. The Company then failed to pay most of its vendors for the 2017 inventory leading to accounts payable of more than $4 million. As a result, the Company did not purchase new inventory from January 2018 to March 2018.

14.    The Company's financial issues were further exacerbated by its disadvantageous pricing of merchandise and various high overhead costs, including burdensome real property lease payments for certain of its stores and a number of its employee salaries.

15. In the months immediately following my acquisition of HP, I caused the Company to engage in a number of restructuring efforts including: renegotiating several of its store leases to obtain terms more favorable to the Company, reducing corporate overhead by eliminating certain employee positions and purchasing new inventory to attract customers. Additionally, in July 2018, I spearheaded the Company's entry into a $6.5 million asset based lending facility under the Second Avenue Loan Documents.

16. In August 2018, however, Second Avenue notified the Debtor that – approximately a month after entering into the lending facility - it was in default under the Second Avenue Loan Document. The following month Second Avenue sent a second notice of default to the Company. And in October 2018, Second Avenue notified the Company of its intent to no longer advance funds under the Second Avenue Loan Agreement – threatening to exercise its rights and remedies under the Second Avenue Loan Documents (including a threat to liquidate the Debtor and cease its operations). Second Avenue's actions and threatened actions have precipitated the Debtor's immediate need for relief under the Bankruptcy Code. The Debtor, accordingly, now seeks to utilize the "breathing-spell" afforded under the chapter 11 process to properly restructure and reorganize its affairs and propose a chapter 11 plan that would provide those creditors with meaningful recoveries.

### III.
### Information Required by Local Rule 2015-2

17. Pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 2015-2, this Affidavit provides the following information:

18. Set forth in the attached Exhibit A is a summary of the Debtor's assets and liabilities.

6

19.     Set forth in the attached Exhibit B is a list of the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor (other than bank accounts which may be subject to claims or setoff), or agent for any such entity.

20.     Set forth in the attached Exhibit C is a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

21.     Set forth in the attached Exhibit D is a list of the locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

22.     Set forth in the attached Exhibit E is the estimated amount of the weekly payroll payable to employees for the thirty-day period following the Petition Date, including the amount paid or proposed to be paid to officers, stockholders, and directors of the Company; and a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remaining unpaid (other than professional fees), for the thirty-day period following the Petition Date.

23.     Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of, or the validity of any claim, (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing. The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

7

## IV.
### First Day Pleadings and Orders

24.     Concurrently with the commencement of this chapter 11 case, the Debtor has filed a number of First Day Pleadings and, at the "first day" hearing, will seek orders approving those pleadings and associated proposed orders (collectively, the "First Day Pleadings and Orders").  I have reviewed each of the First Day Pleadings and Orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  I believe that the relief sought in each of the First Day Pleadings and Orders (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its business or loss of going concern value and (b) constitutes a critical step to the Debtor's efforts to reorganize its business.  I further believe that the requested relief is in the best interest of the estate.

### Creditor Consolidation Motion

25.     The Debtor requests that the Court authorize it to (i) prepare a list of creditors in electronic format in lieu of a mailing matrix and (ii) mail notices to creditors.

26.     The Debtor contends that permitting it to maintain a list of its creditors in electronic format in lieu of filing a creditor matrix is warranted under the circumstances.  I am informed that converting the Debtor's information, which is currently in multiple formats, including computerized and hardcopy, to a format compatible with the matrix requirements would be an unduly burdensome task, as the Debtor's personnel to perform such task is limited to two individuals in the Debtor's accounting department, who along with the Debtor's other personnel will be focused on critical operational tasks aimed at stabilizing the business during the early days of this chapter 11 case.

27.     I believe that the relief requested in the Creditor Consolidation Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will preserve the assets of the Debtor's estate during the chapter 11 process without prejudice to any party in interest.  Accordingly, I respectfully submit that the Creditor Consolidation Motion be approved.

**Motion to Extend Time to File Schedules**

28.     The Debtor seeks entry of any order extending the time for it to file its statements of financial affairs and schedules of assets and liabilities (collectively, the "Schedules and Statements"), for an additional thirty (30) days pursuant to Bankruptcy Rules 1007 and 9006.

29.     To prepare the Schedules and Statements, the Debtor will have to compile information from voluminous books, records, and documents.  The limited time and resources available to the Debtor to marshal the required information to complete the Schedules and Statements, necessitate an extension of the deadline for the Debtor to file those documents.  The Debtor has begun compiling the information that will be required to complete the Schedules and Statements; however, the 14-day time period provided by Bankruptcy Rule 1007 will not give the Debtor sufficient time to complete them.  Further, the Debtor has a limited number of people available to assist in preparing the Schedules and Statements.  As a result, the Debtor does not anticipate that it will be able to complete the Schedules and Statements timely.

30.     I believe that a 30-day extension is necessary due to the vast amount of information that the Debtor must assemble and compile, and the number of hours required to complete the Schedules and Statements.  Additionally, I believe the Debtor should initially focus its attention on vital operational issues during the initial phases of this case, which will help the

9

Debtor make a smooth and orderly transition into chapter 11, ultimately maximizing the value of the Debtor's estate for the benefit of creditors and all parties in interest.

31.    Therefore, I believe that the extension requested is necessary for the Debtor; however, I also believe that the Debtor will be able to file its Schedules and Statements within the 30-day extension requested.

**Cash Management Motion**

32.    The Debtor requests entry of interim and final orders authorizing, but not directing: (i) the continued maintenance of the Debtor's existing bank accounts; (ii) the continued use of the Debtor's existing business forms; (iii) the continued use of the Debtor's existing cash management system; and (iv) a waiver of certain operating guidelines relating to bank accounts.

33.    The Debtor maintains a cash management system (the "Cash Management System") that facilitates the efficient flow and management of funds involved in the Debtor's business operations. The Cash Management System addresses the specific needs of the Debtor, which ensures its ability to efficiently monitor and control its cash position.

34.    In connection with the Cash Management System, the Debtor maintains two (2) bank accounts (the "Bank Accounts") at KeyBank National Association. The Debtor also maintains a bank account at NBT Bank, N.A., but this account is currently inactive. The first account (ending in Acct No. 3399) serves as the Debtor's primary operations account (the "Operating Account"). The Operations Account holds funds drawn from the Debtor's Second Avenue Credit Facility and is used to pay the Debtor's obligations, including, but not limited to, obligations related to payroll, supplier accounts, rental obligations, and other accounts payable. On average, the Operating Account receives an aggregate amount of approximately $1.9 million per month and disburses an aggregate amount approximately $1.9 million per month.

10

35.    The Debtor's second account (ending in Acct. No. 1830) serves as the Debtor's deposit account (the "Deposit Account"). All customer receipts are deposited into the Deposit Account. On average, the Deposit Account receives approximately $1.4 million per month, depending upon the Debtor's sales. All amounts in the Deposit Account are swept to Second Avenue on a daily basis.

36.    The Debtor will continue to maintain records with respect to all transfers between the Bank Accounts so that all transactions are accurately recorded and readily ascertainable. The Debtor is able to trace funds through the Cash Management System, and the Debtor is able to track and reconcile payments on its behalf. The Debtor therefore requests that the Court authorize it to continue to use its existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System in the ordinary course of business.

37.    I believe that the continued use of the Cash Management System is in the best interest of Debtor's estate and its creditors as the continued use of the Cash Management System Bank Accounts will allow the Debtor to effectively function while in chapter 11. Accordingly, I respectfully submit that the Cash Management Motion be approved.

**Employee Wages Motion**

38.    The Debtor seeks authority to pay prepetition obligations to current employees (the "Employees"), including accrued prepetition wages, in an amount not to exceed $12,850 for each employee (collectively, "Employee Wage Claims").

39.    As set forth above, as of the Petition Date, the Debtor had 280 Employees: 39 salaried Employees, and 241 full and part-time hourly Employees. The Debtor pays the Employees on a weekly basis, with such weekly payroll averaging approximately $121,471.56.

11

As of the Petition Date, the Debtor estimates owing approximately $70,000 in accrued Employee Wage Claims.

40.     I contend that the Employees are essential to the ongoing operation of the Debtor's business.  Indeed, the Employees serve the Debtor's customers, maintain the Debtor's stores, and provide all essential functions to the Debtor's ongoing operations.  Without the continued services of the Employees, I do not believe that we can successfully reorganize the Company.

41.     I assert that if prepetition wages and benefits are not received by the Employees in the ordinary course, the Employees will suffer extreme personal hardship and, in many cases, will be unable to pay their basic living expenses. Such result would destroy Employee morale and result in considerable Employee turnover, causing immediate and widespread damage to the Debtor's ongoing business operations – in turn, causing significant harm to the Debtor and its estate.

42.     Accordingly, I believe that the relief requested in the Employee Wages Motion is in the best interest of the Debtor's estate and will enable the Debtor to continue to operate its business without disruption so as to avoid immediate and irreparable harm. I respectfully request that the Employee Wages Motion be approved.

**Customer Programs Motion**

43.     The Debtor requests entry of interim and final orders authorizing the Debtor to continue to operate customer programs (the "Customer Programs"), including the authority to continue, renew, replace, and/or terminate one or more Customer Programs and implement new Customer Programs, in each case, as the Debtor deems appropriate in the

ordinary course of business, thereby ensuring and maintaining customer satisfaction and loyalty without interruption throughout the duration of this chapter 11 case.

44.    As more fully described in the Customer Programs Motion, the Debtor's Customer Programs include the following programs:

a) <u>Returns and Exchange Policies</u>: Consistent with industry practice and to accommodate customers' needs, the Debtor maintains return, refund, and exchange policies with respect to both cash and credit purchases (collectively, the "Return and Exchange Policies"). The Return and Exchange Policies assure the Debtor's customers that they will be "made whole" if merchandise is inadequate, damaged or defective, incorrectly processed, or unavailable. By this Motion, the Debtor seeks authorization to honor the Return and Exchange Policies with respect to merchandise purchased prior to and after the Petition Date.

b) <u>Customer Reward Membership Program</u>: Customers of the Debtor who are members of its Rewards Membership Program receive, as a reward, two percent of the total purchase price when shopping with the Debtor as a discount towards their next purchase.

c) <u>Sales Promotions</u>: Like most other retailers, the Debtor regularly conducts in-store and online sales promotions (the "Sales Promotions"). The Debtor typically advertises its Sales Promotions by sending out mass electronic mailings notifying customers of current deals available for redemption at the Debtor's stores and websites. By the Customer Programs Motion, the Debtor seeks authorization to continue conducting Sales Promotions and honoring obligations related thereto in the ordinary course of business, including with respect to any obligations that arose prior to the Petition Date.

d) <u>Gift Card Program</u>: The Debtor maintains a program by which their customers can purchase gift cards that can be redeemed for the Debtor's merchandise at a later date (the "Gift Card Program"). The Debtor's gift cards can be purchased in the Debtor's stores and online. As of the Petition Date, the Debtor estimates that the aggregate amount outstanding in issued gift cards is approximately $546,940.68. The Debtor believes that any customer claims arising under the Gift Card Program may be entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code, as it is unlikely that any individual customer would have a claim in excess of the priority amount of $2,850. By this Motion, the Debtor seeks authority to maintain the Gift Card Program and to honor all gift cards

purchased by customers prior to the Petition Date. In addition, the Debtor seeks authority to continue performing all of its obligations under agreements with the Gift Card Agents in the ordinary course of business.

e)  Credit Cards and Other Payment Processors:  In addition to cash, the Debtor accepts the following methods of payment from customers at in-store and online points of sale: (i) Visa, MasterCard, American Express, Discover, and debit cards; and (ii) PayPal at online points of sale only (the "Non-Cash Payments"). To process Non-Cash Payments, the Debtor is a party to certain agreements (the "Payment Processing Agreements") with payment processors (the "Payment Processing Companies" and each, a "Payment Processing Company"). Pursuant to the Payment Processing Agreements, the Debtor generally receives gross customer sales in a designated Debtor bank account (a "Designated Account") and then is immediately debited any chargebacks, returns, and processing fees charged. When customers either return merchandise to the Debtor following a purchase made by Non-Cash Payment or dispute charges with a Payment Processing Company, the Debtor may be obligated to refund to such Payment Processing Company the purchase price of the returned merchandise or the amount of disputed charge, subject to certain adjustments ("Chargebacks," or the "Processing Obligations"). Generally, Chargebacks are debited from a Designated Account. It is likely that certain Processing Obligations incurred by the Debtor immediately prior to the Petition Date may not have been fully debited from the Debtor's account prior to the Petition Date. The Debtor's continued acceptance of Non-Cash Payments is essential to the operation of the Debtor's business because the majority of the Debtor's sales—indeed, the majority of all retail sales—are made using Non-Cash Payments. Declining to accept Non-Cash Payments would have a severe negative effect on the Debtor's ongoing operations, the cost of which would be borne by the estate. To avoid disrupting these vital payment processing services, the Debtor seeks authority to pay any prepetition Processing Obligations incurred in connection with processing any Non-Cash Payments and to continue paying the Processing Obligations in the ordinary course of business pursuant to the terms of the Payment Agreements, in a manner consistent with past practices.

45.    The Debtor requests authority to maintain and administer the Customer Programs and to pay prepetition obligations related thereto in the ordinary course of business and in a manner consistent with past practices.  I believe that the Debtor will suffer immediate and irreparable harm absent the authority requested, as the inability to maintain the Customer

Programs will harm the Debtor's reputation and ability to maintain customer loyalty and support. Further, I believe that maintaining the Customer Programs will encourage customers to continue to purchase the Debtor's products thus helping maintain revenues during the chapter 11 case. Accordingly, I respectfully ask that the court grant the relief sought in the Customer Programs Motion.

### Motion to Confirm Protections of Automatic Stay and *Ipso Facto* Provisions

46.    The Debtor requests a protective order enforcing and restating the automatic stay and *ipso facto* provisions of the Bankruptcy Code. I have been advised that the certain of the Debtor's creditors may not be well versed in the restrictions of the Bankruptcy Code, specifically the automatic stay provision of Bankruptcy Code section 362. Many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11 protection or are unfamiliar with the scope of a debtor in possession's authority to conduct its business. These creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.

47.    Furthermore, I believe that it is possible that certain parties may attempt to engage in activities that violate the automatic stay upon learning of the chapter 11 case, including, but not limited to, aggressive collection efforts against the Company. I believe that an order from the Bankruptcy Court will prevent such acts, and preempt further disputes before this Court.

48.    Additionally, I believe that the relief requested in the Automatic Stay Motion will help facilitate the Debtor's orderly entry into chapter 11 and will help avoid disruptions and distractions that could divert the Debtor's attention from more pressing matters during the initial phase of this case. Accordingly, I believe it is the best interests of the Debtor's

estate to be granted an order enforcing and restating the automatic stay and *ipso facto* provisions of the Bankruptcy Code.

**Tax Motion**

49.     The Debtor seeks authority to pay potential prepetition taxes and similar obligations (collectively, the "Taxes"), to the respective taxing or other appropriate authorities (the "Taxing Authorities") in the ordinary course of the Debtor's business, including, but not limited to, the payment of corporate Taxes relating to any tax returns that have yet to be filed, which arise from prepetition periods.

50.     As of the Petition Date, the Debtor believes that there may be outstanding accrued and unpaid prepetition liabilities owing to Taxing Authorities. The Debtor seeks authority to pay all Taxes owing should any become due.

51.     The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby creating a greater recovery for creditors.  If such obligations are not timely paid, the Debtor will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each taxing authority's applicable laws, and whether penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured, or unsecured in nature.

52.     In addition, to the extent the Debtor has not yet sought to remit payment to the taxing authorities with respect to certain Taxes, the Debtor seeks authorization to issue checks or provide for other means of payment to the taxing authorities as necessary to pay the Taxes.

53.    Thus, to prevent immediate and irreparable harm to the Debtor's business and reorganization efforts, I believe that the relief requested in the Tax Motion is in the best interest of the Debtor's bankruptcy estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate in chapter 11 without disruption.    Accordingly, I respectfully submit that the Taxes Motion should be approved.

**Administrative Expense Motion**

54.    The Debtor requests authority to (i) grant administrative priority expense status to undisputed obligations arising from the postpetition delivery of goods and services ordered prepetition and (ii) authorizing, but not directing, the Debtor to pay such obligations in the ordinary course of business.

55.    As is common in the retail industry, the Debtor relies on third-party vendors (collectively, the "Vendors") to provide it with the goods and services necessary to maintain its day-to-day operations.

56.    As of the Petition Date, the Debtor has certain outstanding purchase orders with these Vendors for the delivery of goods and services that are necessary for the ordinary operation of the Debtor's business (the "Prepetition Orders").

57.    Any disruption in the Debtor's supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtor not having sufficient products and supplies to operate and to provide a seamless customer experience.    Such a result could potentially have a devastating impact on the Debtor's business and significantly impair its restructuring efforts.

58.    Vendors may be concerned that the obligations arising from goods or services ordered prepetition and subsequently delivered or rendered postpetition will be treated

as general unsecured claims against the Debtor's estate.  As a result, Vendors may refuse to ship such goods, recall current shipments, or not perform services promised under Prepetition Orders.

59.     I believe that an order of the Court clarifying the administrative expense priority status of Prepetition Orders delivered postpetition will alleviate much uncertainty and facilitate the Debtor's ability to conduct its business in an ordinary and uninterrupted fashion throughout its chapter 11 case.

60.     Further, I believe that granting the Debtor the authority to pay obligations on account of Prepetition Orders will ensure that Vendors remain willing to do business with the Debtor going forward.  These Vendor relationships are crucial to maintaining the enterprise value of the Debtor's business, and ultimately, to the success of this chapter 11 case.  Therefore, I respectfully submit that the Administrative Expense Motion should be approved.

**Cash Collateral Motion**

61.     The Debtor seeks authority to use cash collateral, as that term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), that may be subject to the security interests of the Debtor's prepetition secured lenders.

62.     Without access to the Cash Collateral, the Debtor will have insufficient liquidity to continue to operate its business and pay restructuring costs associated with this chapter 11 case.  The Debtor's access to the Cash Collateral is necessary to ensure that it has sufficient working capital and liquidity to operate its business and thus preserve and maintain the going concern value of its estate while the Debtor seeks to restructure and reorganize its affairs. Thus, the need for the immediate use of Cash Collateral is paramount.  The Debtor and its estate will suffer irreparable harm if such use is not immediately authorized.  Indeed, the Debtor's inability to use Cash Collateral could potentially result in a piecemeal liquidation of its assets

leading to severely diminished recoveries for parties in interest in this chapter 11 case. The use of Cash Collateral, therefore, will protect the secured lenders' security interests by preserving the value of its collateral.

**Critical Vendors Motion**

63.     The Debtor requests authority to pay certain prepetition claims of third-party vendors deemed to be "critical" to the Debtor's business (the "Critical Vendors").

64.     The Debtor has identified several Critical Vendors that supply goods and services critical to the uninterrupted operation of the Debtor's business. The Critical Vendors were determined following a close review of several factors, including: the goods or services provided by a vendor or supplier; whether goods or services are provided pursuant to a contract or on a purchase-order basis; whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or provide critical services on a postpetition basis; whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; whether the vendor is a sole- or limited-source or high-volume supplier for branded and "in-demand" inventory due to particular local, regional, or national customer preferences; whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtor would be able to continue operating while transitioning business thereto; whether the Debtor's inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and whether failure to pay the particular vendor could jeopardize the Debtor's valuable interest in merchandise.

65.     Without the relief granted in the Critical Vendor Motion, the Critical Vendors may refuse to supply to the Debtor essential products, services, and supplies. Failure to

receive these goods and services could cause serious disruptions to the continuous and timely flow of services and supplies that are essential to the Debtor's business. Paying the prepetition obligations owed to these vendors in the ordinary course of business will thus benefit the Debtor's estate and its creditors by allowing the Debtor's business operations to continue without interruption. Additionally, with respect to Critical Vendors, the Debtor intends only to make payments where the Debtor has determined that the payment is necessary and in the best interest of the Debtor and its estate. Further, the Debtor will seek to require the Critical Vendors to enter into trade agreements with the Debtor as a condition to receiving payment of their Critical Vendor Claim, thereby ensuring that the Debtor has a committed supply of the critical goods and services provided by Critical Vendors. I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will provide the Debtor's business operations a smooth transition into chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Critical Vendor Motion should be approved.

**Shippers/Lienholders/503(b)(9) Claimants Motion**

66. The Debtor seeks entry of interim and final orders pursuant to sections 363(b)(1), 105(a) and 503(b)(9) of the Bankruptcy Code authorizing, but not directing, the Debtor to pay, up to certain caps dictated in the motion: (a) prepetition claims held by common carriers and transportation service providers, and other related parties (collectively, the "Shippers"); (b) prepetition claims held by third party service providers or contractors who may be permitted to assert statutory or possessory liens against the Debtor's leaseholds and property (collectively, the "Lien Claimants"); and (c) claims owed on account of goods and other

materials received from various parties within the twenty (20) days prior to the Petition Date (the "503(b)(9) Claims").

67.     I believe the payment of Shippers and Lienholders is necessary to the continued efficient operations of the Debtor, and is in the best interests of the Debtor's estate and creditors.  If the Debtor fails to pay the Shippers and Lienholders, such parties may exercise possessory liens and block the Debtor's access to merchandise in transport, and may refuse to provide future services for the Debtor. Thus, the Debtor's failure to pay the Shippers and Lienholders could severely impair the Debtor's ability to operate its business.

68.     Additionally, the 503(b)(9) Claims must be paid in full for the Debtor to confirm a plan.  Consequently, payment now only provides such creditors what they would otherwise be entitled to receive under a chapter 11 plan.

69.     I believe that the relief requested in the Shippers, Lienholders, and 503(b)(9) Claimants Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest, and will provide the Debtor's business operations a smooth transition into chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Shippers, Lienholders, and 503(b)(9) Claimants Motion.

The foregoing is true and correct to the best of my knowledge and belief.

Dated:     Rome, New York
           October 8, 2018

_____
Guy Viti

SWORN TO before me this
8th day of October, 2018

RANDOLPH B. SOGGS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SO6026627
Qualified in Oneida County
Commission Expires November 24, 2019

21

# EXHIBIT A

## EXHIBIT A

### Summary of the Debtor's Assets and Liabilities

Pursuant to Local Bankruptcy Rule 2015-2(b)(2), the following are estimates of the Debtor's total assets and liabilities.  The following financial data is the latest available information and reflects the Debtor's financial condition as of August 31, 2018.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

**Total Assets: $5,626,891**
**Total Liabilities: $6,575,466**

# EXHIBIT B

**EXHIBIT B**

**Debtor's Property Not in Debtor's Possession**

As required under Local Bankruptcy Rule 2015-2(b)(3), to the best of the Debtor's knowledge, the Debtor represents that it does not have property that is not in its possession.  To the extent the Debtor paid any professional fee retainers to professionals, these can be viewed within the individual professional fee applications.

# EXHIBIT C

**EXHIBIT C**

**Debtor's Premises**

As required under Local Bankruptcy Rule 2015-2(b)(4), the following lists the premises owned, leased or held under other arrangement from which the Debtor operates its business as of the Petition Date.

| Property Address | City | State | ZIP Code | Description |
|---|---|---|---|---|
| 1899 Black River Boulevard | Rome | NY | 13440 | Retail Store and Distribution Location |
| NH Shopping Center 1 Center Street | New Hartford | NY | 13413 | Retail Store Location |
| 2044 Glenwood Shopping Plaza | Oneida | NY | 13421 | Retail Store Location |
| 1283 Arsenal Street | Watertown | NY | 13601 | Retail Store Location |
| 7421 Oswego Road, Route 57 | Liverpool | NY | 13090 | Retail Store Location |
| Arcadia Shopping Center | Newark | NY | 14513 | Retail Store Location |
| 293 Street, Route 104 East | Oswego | NY | 13126 | Retail Store Location |
| Dewitt Town Center 3179 Erie Boulevard East | Dewitt | NY | 13214 | Retail Store Location |
| 232 West Albany Street | Herkimer | NY | 13350 | Retail Store Location |

# EXHIBIT D

## EXHIBIT D

**Location of Debtor's Substantial Assets and Books and Records,
and Nature and Location of Debtor's Assets Outside of the United States**

As required under Local Bankruptcy Rule 2015-2(b)(5), the following lists the location of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

The Debtor's substantial assets as well as its books and records are located at: 1899 Black River Boulevard, Rome, New York, 13440

Nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States:

| Description of Asset | Location of Asset | Value of Asset |
|---|---|---|
| N/A | N/A | N/A |

# EXHIBIT E

| 30 Day Budget | Forecast | Forecast | Forecast | Forecast | |
|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | |
| Week Ended | 10/6/2018 | 10/13/2018 | 10/20/2018 | 10/27/2018 | Total |
| **Dollars in '000s** | | | | | |
| Sales | 400 | 632 | 632 | 632 | 2,296 |
| | | | | | |
| **Cash Receipts** | **400** | **632** | **632** | **632** | **2,296** |
| | | | | | |
| **Operating Disbursements:** | | | | | |
| Merchandise | - | 221 | 221 | 221 | 662 |
| Weekly Wages | 91 | 91 | 91 | 110 | 383 |
| Payroll Taxes | 36 | 36 | 36 | 44 | 152 |
| Employee 401(K) | 6 | 6 | 6 | 6 | 24 |
| Rent | 82 | 69 | 74 | - | 225 |
| Employee Benefits | 40 | - | - | - | 40 |
| Insurance | - | - | - | 10 | 10 |
| Computer (Software) | - | - | - | 10 | 10 |
| Utilities | 3 | - | - | 5 | 8 |
| Auto & Mileage | - | - | - | 2 | 2 |
| Repairs & Maintenance | - | - | - | 3 | 3 |
| Supplies | 1 | 1 | 0 | - | 1 |
| Security | - | - | - | - | - |
| Bank/CC Processing Fees | 10 | - | 2 | - | 12 |
| Telephone & Internet | - | 10 | - | - | 10 |
| Freight | - | 11 | 11 | 11 | 33 |
| Advertising | - | - | - | 50 | 50 |
| Professional Fees | - | 5 | 5 | 5 | 15 |
| Other | 1 | - | - | - | 1 |
| **Total Operating Disbursements** | **270** | **449** | **446** | **476** | **1,641** |
| | | | | | |
| **Net Cash Flow from Operations** | **130** | **183** | **186** | **156** | **655** |
| | | | | | |
| **Non-Operating Disbursements** | | | | | |
| Taxes | | | 120 | | 120 |
| Non-Operating Professional Fees | - | - | - | 300 | 300 |
| **Non-Operating Disbursements** | **-** | **-** | **120** | **300** | **420** |
| | | | | | |
| **Net Cash Flow** | **130** | **183** | **66** | **(144)** | **235** |
| | | | | | |
| Beginning Cash Balance (net of O/S checks) | - | 130 | 313 | 379 | - |
| Cash Receipts | 400 | 632 | 632 | 632 | 2,296 |
| Cash Disbursements | (270) | (449) | (566) | (776) | (2,061) |
| **Ending Cash Balance** | **130** | **313** | **379** | **235** | **235** |

30 Day Budget

## EXHIBIT E

### Postpetition 30-Day Budget

As required under Local Bankruptcy Rule 2015-2(c)(1) and (2), attached hereto is a postpetition 30-day budget, including estimated weekly payments to employees, the Debtor's sole officer and consultants.  Specifically, the total payments to employees, including the Debtor's sole officer is approximately $383,000.  The Debtor will supplement this Exhibit to provide the specific amounts proposed to be paid to consultants.